[Cite as *Goad v. Goad*, 2014-Ohio-3534.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

| | | |
|---|---|---|
| DEWAYNE GOAD | | C.A. No.     13CA0097-M |
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| JUDY GOAD | | COURT OF COMMON PLEAS COUNTY OF MEDINA, OHIO |
| Appellant | | CASE No.     05DR0638 |

DECISION AND JOURNAL ENTRY

Dated: August 18, 2014

WHITMORE, Judge.

{¶1}    Appellant, Judy Goad, n.k.a. Matulevicus, ("Mother"), appeals from the judgment of the Medina County Court of Common Pleas, Domestic Relations Division, granting Dewayne Goad ("Father") custody of their minor child. This Court affirms.

I

{¶2}    Mother and Father were married in June 1989 and had three children during the marriage: Ch.G., born in 1991; Cod.G., born in 1994; and Col.G., born in 1998. The parties were divorced in Kentucky in June 2005. As part of their divorce, the parties agreed to a shared custody arrangement where Mother was the residential parent and Father had scheduled visitations. At the time of the divorce, the parties agreed that Mother and the children would reside in Ohio. Father subsequently moved to Michigan.

{¶3}    In November 2005, Father filed a motion, in part, to modify his parenting time. On November 27, 2006, the court entered an agreed order of parenting time. According to this

order, Father was to have parenting time the first weekend of each month in Ohio and the third weekend of each month in Michigan. On the Michigan weekends, the parties were to meet in Toledo to exchange the children.

{¶4} In late October 2010, Mother was hospitalized for a brain aneurysm. Father filed a motion for emergency custody of the children, but dismissed his motion shortly thereafter, when it appeared Mother had been released from the hospital. On December 13, 2010, Father filed a motion, in part, requesting custody of the two youngest children.[1] On December 17, 2010, hours before the parties were to meet in Toledo to commence Father's weekend visitation, Mother filed an emergency motion to suspend Father's parenting time. The court granted Mother's ex parte motion that same day. After a hearing on January 5, 2011, the court granted Father visitation, but required that it be supervised. In May 2011, the court ordered Father's visitation restored to the terms of the 2006 order. The court further ordered a psychological evaluation of the parents and the two minor children. Dr. Robin Tener, a clinical psychologist, conducted the psychological evaluation and provided the court with a custody recommendation.

{¶5} A final hearing was held on March 7, 2012, March 9, 2012, March 30, 2012, and April 6, 2012. On May 16, 2012, the court conducted an in camera interview of the two youngest children, although it noted that Cod.G. had recently become emancipated.[2] On July 17, 2012, the magistrate issued a decision granting Father residential custody of Col.G., the only remaining minor child. Mother timely filed objections to the magistrate's decision. On October 29, 2013, the court overruled Mother's objections. Mother now appeals and raises one assignment of error for our review.

---

[1] At this point, Ch.G., the oldest child, was 19 years old.
[2] Cod.G. turned 18 years old ten days prior to the in camera interview and had just graduated from high school.

II

Assignment of Error

THE TRIAL COURT ERRS IN FINDING A CHANGE OF CIRCUMSTANCES AND THAT THE BEST INTEREST OF THE CHILD IS SERVED BY MODIFYING CUSTODY WHERE THE MANIFEST WEIGHT OF THE EVIDENCE SHOWS THAT THE MOTHER MADE EXTENSIVE EFFORTS TO ACCOMMODATE THE CHILD'S MENTAL HEALTH NEEDS IN ORDER TO HAVE A HEALTHY ADJUSTMENT TO SCHOOL, THAT THE CHILD HAD MADE TREMENDOUS STRIDES IN SCHOOL, HIS HEALTH, AND HIS FRIENDS, THAT THE CHILD DESIRED TO LIVE WITH HIS MOTHER, AND THAT THE GAL RECOMMENDED THAT THE CHILD RESIDE WITH HIS MOTHER AND THAT SHE RETAIN CUSTODY[.] (Sic.)

**{¶6}** In her sole assignment of error, Mother argues that the court erred in finding that a change in circumstances had occurred since the 2006 order and that it is in Col.G.'s best interest to reside with Father. We disagree.

**{¶7}** "When reviewing an appeal from the trial court's ruling on objections to a magistrate's decision, this Court must determine whether the trial court abused its discretion in reaching its decision." *Fields v. Cloyd*, 9th Dist. Summit No. 24150, 2008-Ohio-5232, ¶ 9. "In so doing, we consider the trial court's action with reference to the nature of the underlying matter." *Tabatabai v. Tabatabai*, 9th Dist. Medina No. 08CA0049-M, 2009-Ohio-3139, ¶ 18.

**{¶8}** "It is well established that an appellate court will not disturb the custody decision of a trial court absent a finding that the trial court abused its discretion." *Syverson v. Syverson*, 9th Dist. Lorain No. 12CA010205, 2012-Ohio-5569, ¶ 7, quoting *Lempner v. Lempner*, 9th Dist. Lorain No. 04CA008580, 2005-Ohio-4543, ¶ 7. "[A] trial court's determination in custody matters 'should be accorded the utmost respect' because '[t]he knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record.'" *Wintrow v. Baxter-Wintrow*, 9th Dist. Summit No. 26439,

2013-Ohio-919, ¶ 10, quoting *Baxter v. Baxter*, 9th Dist. Lorain No. 10CA009927, 2011-Ohio-4034, ¶ 6.

{¶9} R.C. 3109.04(E)(1)(a) provides, in relevant part, that:

The court shall not modify a prior decree allocating parental rights and responsibilities for the care of the children unless it finds, based on the facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and * * * [t]he harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.

{¶10} In evaluating whether a civil judgment is against the manifest weight of the evidence, a reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." (Internal citations and quotations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. The manifest weight of the evidence standard of review is the same for civil and criminal cases. *See id*. at ¶ 7-10.

{¶11} A weight of evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id*. The court's "discretionary power to grant a new trial should be exercised only in exceptional cases where the

evidence weighs heavily against the [judgment]." *State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

**Change in circumstances**

{¶12} To justify modifying a prior custody order, the court must find "that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree." R.C. 3109.04(E)(1)(a). The change in circumstances must be one of substance, not merely a slight or inconsequential change. *Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997). "In determining whether a change in circumstances has occurred so as to warrant a change in custody, a trial judge, as the trier of fact, must be given wide latitude to consider *all issues* which support such a change." (Emphasis added.) *Id*. at paragraph two of the syllabus.

{¶13} In overruling Mother's objections, the trial court found that a change in circumstances had occurred since the 2006 order. Specifically, the court cited to Col.G.'s various mental health diagnoses, his threat to commit suicide, and his struggles both socially and academically. On appeal, Mother argues that Col.G.'s mental health issues are "conditions" and not changes in circumstances. Further, Mother argues, she did not bring about these conditions, could not have prevented them, and has attempted to address Col.G.'s mental health issues and behavioral problems.

{¶14} First, the statute applicable to modification of parental rights and responsibilities does not discuss the cause of the change in circumstances. *See* R.C. 3109.04(E). Therefore, the focus of the inquiry is not on the cause of the change; instead, the necessary focus is on whether there has been a change at all. *See, e.g., Davis*, 77 Ohio St.3d at 420 (a change in circumstances may, in part, be created by "the maturing of the child"); *LaBute v. LaBute*, 179 Ohio App.3d 696,

2008-Ohio-6190, ¶ 8 (3d Dist.) (A change in circumstances does not require a finding that the child suffered adverse consequences from the change.). Of course, the cause of the change in circumstances may be a relevant factor when assessing the best interest of the child. *See* R.C. 3109.04(F)(1) (in determining the best interest of the child, the court shall consider all relevant factors).

**{¶15}** Second, while Col.G.'s mental health issues may be medically labeled as conditions, mental health issues may be changes in the circumstances. *See Banchefsky v. Banchefsky*, 10th Dist. Franklin No. 13AP-300, 2014-Ohio-899, ¶ 21 (pre-decree mental health records relevant to determine if change in circumstances had occurred). *See also In re A.P.D.*, 8th Dist. Cuyahoga No. 100504, 2014-Ohio-1632, ¶ 47 ("Mother's potential alcohol problem and potential mental health problems are new issues" and constituted a change in circumstances.).

**{¶16}** A review of the record shows that several changes in circumstances have taken place since the agreed custody order in November 2006. Col.G., the only remaining minor, was diagnosed with Asperger's Syndrome, Obsessive Compulsive Disorder ("OCD"), Attention Deficit Disorder ("ADHD"), and Trichotillomania, a disorder that causes him to pull out his facial hair.[3] In December 2011, Col.G. wrote a note that indicated suicidal thoughts. There was testimony that Col.G. struggled academically and socially in school. While it is unclear when exactly these struggles began, there is evidence that his social struggles have escalated as he has grown older. Specifically, Mother testified that Col.G. began to be bullied by other children in

---

[3] While the record is unclear when Col.G. received these various diagnoses, there is evidence that at least some of them occurred post-2006. Specifically, there is testimony that Col.G. began plucking his eyelashes around December 2008 and his eyebrows sometime thereafter. Additionally, in October 2010, Col.G. was tested by the school psychologist and determined to qualify for an Individualized Education Program ("IEP").

fifth and sixth grade. Based on our review of the record, we cannot conclude that the trial court abused its discretion in finding that a change in circumstances had occurred.

**Best interest of Child**

{¶17} Once the court determines that a change in circumstances has occurred, it must then determine whether a modification of the parental rights and responsibilities is in the best interest of the child. R.C. 3109.04(E)(1)(a). In determining the best interest of the child, "the court shall consider all relevant factors, including, but not limited to" the factors listed in R.C. 3109.04(F)(1).

**R.C. 3109.04(F)(1)(b)**

{¶18} "If the court has interviewed the child in chambers * * * regarding the child's wishes and concerns as to the allocation of the parental rights and responsibilities concerning the child, [the court shall consider] the wishes and concerns of the child, as expressed to the court[.]" R.C. 3109.04(F)(1)(b). Mother argues that the trial court erred in failing to consider Col.G.'s wishes expressed to the magistrate during the in camera interview, in accordance with R.C. 3109.04(F)(1)(b).

{¶19} The magistrate conducted an in camera interview of Col.G. and Cod.G. on May 16, 2012.[4] However, there is no evidence in the record as to what Col.G. expressed to the court during that in camera interview. In its entry, the magistrate questioned whether Col.G. was "of sufficient age and maturity to express his wishes and concerns," but stated that she had considered the interview when "making a best interest determination." Based on the limited record before us, we conclude that the court properly considered Col.G.'s wishes, whatever those

---

[4] Because Cod.G. had become emancipated the court focused only on Col.G. in its entry.

may have been, as expressed to it during the in camera interview in accordance with R.C. 3109.04(F)(1)(b).

**R.C. 3109.04(F)(1)(c)**

{¶20} The court must also consider "[t]he child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest." R.C. 3109.04(F)(1)(c). Col.G. lived with his two older brothers in Mother's household. Col.G.'s oldest brother, Ch.G., also has special needs. In the Guardian ad Litem's ("GAL") initial report she noted that she "believe[d] that the current home environment containing another special needs child contribute[d] to [Col.G.'s] stress and anxiety." Dr. Robin Tener, the clinical psychologist that conducted the custody evaluation for the court, also reported that Ch.G. was a source of stress for Col.G. Dr. Tener and the GAL testified that the middle child, Cod.G., was often responsible for keeping the peace between Col.G. and Ch.G. According to Dr. Tener, Cod.G. was "very parentified" and worried about how Mother would manage if he was not around to help her. Cod.G. was applying for colleges and hoping to enroll in the fall of 2012. Dr. Tener explained that one of her concerns regarding Mother was her inability to recognize the stress present in the household. Dr. Tener remarked that Mother "did not seem to note these sibling interaction issues as factors that might be contributing to deficits in [Col.G.'s] functioning and his level of anxiety/tension."

{¶21} Dr. Tener found that Father's house could provide a more peaceful environment for Col.G. because he would not have to "contend with a sibling." Father testified that he is not currently working and is able to spend the necessary time with Col.G. to address his developmental issues. Dr. Tener and the GAL testified that there were no concerns with Col.G. interacting with Father or his new wife.

**R.C. 3109.04(F)(1)(d)**

{¶22} In determining the best interest of the child, the court shall consider "[t]he child's adjustment to the child's home, school, and community[.]" R.C. 3109.04(F)(1)(d). Mother argues that the court erred in finding that Col.G. had "not adjusted to his school or community." In support of her argument, Mother cites to the weeks preceding the hearing to show Col.G. had made substantial improvements in school. Mother contends that this progress is the culmination of years of working to establish a team of medical and educational professionals that can help Col.G. succeed. Because a support team is now in place and Col.G. is progressing, Mother argues, it is not in Col.G.'s best interest to move to Michigan to live with Father.

{¶23} By all accounts, Col.G. is a very intelligent child with a high IQ. Unfortunately, until the weeks immediately preceding the first day of the final hearing, Col.G. had been performing poorly in school, both academically and socially. Ms. Shannon Bender, a special education teacher at Wadsworth Middle School, testified that when she began working with Col.G. in fall of 2011, he would have four or five "meltdowns" a week. Bender described Col.G.'s meltdowns as major crying spells, during which he would refuse to do anything. Ms. Jennifer Manos, Col.G.'s school counselor, testified that Col.G. would be sent to her because he would be crying in class and "would kind of shut down." Manos said she would turn off the lights and play soothing music until Col.G. calmed down. Manos testified that his crying episodes "really started to decrease" in February 2012. Both Manos and Bender agreed that Col.G. had not had any crying spells in the four weeks prior to the hearing on March 9, 2012. The GAL reported similar progress with Col.G.

{¶24} Mother testified that she had been pushing the school for an IEP since Col.G. was in fifth grade, but was told that he "did[ not] have enough diagnoses" at the time. According to

Mother, Col.G. was placed on a 504 Plan instead. Bender described a 504 Plan as a plan for students that are not labeled as special education. Bender explained that the 504 Plan gives accommodations and suggestions to teachers on how to help the student. Mother stated that the 504 Plan was not working for Col.G. and she continued to advocate for Col.G. to be tested for an IEP. Col.G. was tested for an IEP in October 2010 and an IEP was written in May 2011. Bender testified that she was not involved in writing Col.G.'s IEP, but was responsible for implementing it during the 2011-2012 school year. Bender explained that, as Col.G.'s special education teacher, she would be responsible for writing his next IEP in May 2012 and that this IEP would follow him to high school in the fall of 2012.

{¶25} Col.G. undeniably made progress in school in February 2012. Despite this progress, we do not agree that the court abused its discretion in granting residential custody to Father. In the fall of 2012, Col.G. would be entering high school. Therefore, he would no longer be working with Bender and Manos regardless of whether he lived with Mother or Father. Bender testified that the IEP is a federal document and would follow him to whichever school he attended in the fall. Therefore, Col.G. would receive the benefit of the IEP regardless of whether he attended high school in Michigan or Ohio.

{¶26} Dr. Tener conducted a psychological evaluation of Mother, Father, Col.G., and Cod.G. and provided the court with a custody recommendation. In Dr. Tener's lengthy report, she noted that "[Col.G.] made it quite clear that he was not attached to his present school situation, []or to any peer group within his school or his community." Dr. Tener indicated that while Col.G. told her that he had friends at school, he could not provide her with the names of any of his friends. The GAL testified that Col.G. had two friends over when she went to visit sometime before the hearing. The GAL remarked that Col.G. left his friends to speak with her

outside and seemed in no hurry to return to them. Ultimately, the GAL concluded that the visit overall seemed "staged."

{¶27} Dr. Tener recommended that Col.G. reside with Father in Michigan with Mother having visitation every other weekend. Dr. Tener testified that Col.G. would "react" to this change in custody and might even regress during the transition. However, Dr. Tener opined that Col.G. will benefit more in the long-term under the care of Father. Dr. Tener explained that Father's parenting style and awareness of Col.G.'s needs made him better equipped to meet Col.G.'s special needs. Dr. Tener acknowledged that although Mother "is a caring parent to [Col.G.], she cannot provide the focus and perspective that may make the difference between dependence and independence for [Col.G.]" Additionally, Dr. Tener found that Ch.G, who is also developmentally handicapped, added "considerable stress" to the home environment, yet Mother failed to recognize this.

{¶28} Dr. Tener, the GAL, and Father all expressed serious concerns about Mother being able to maintain the progress Col.G. had shown in the weeks prior to the hearing. They noted that Mother seemed to only make progress on things when the court was watching. Specifically, Dr. Tener and the GAL stated that a review of the medical records left them with the impression that Mother only takes Col.G. to counseling when there is litigation pending. Mother disputes that this is true and testified that Col.G. was in counseling in 2009 when no litigation was pending. Nevertheless, Mother admits that there were periods of time when Col.G. was not in counseling.

**R.C. 3109.04(F)(1)(e)**

{¶29} The court must also consider "[t]he mental and physical health of all persons involved in the situation." R.C. 3109.04(F)(1)(e). There is no evidence that Mother suffers from

any mental or physical health issues. According to Mother, she has fully recovered from her brain aneurysm. Father testified that he has been diagnosed with Crohn's disease, acid reflux, and depression. Father stated that he takes medication to manage his conditions. The GAL, in her report, indicated that "Mother has alleged that Father was diagnosed with PTSD." Mother denied making any such allegation. Father denied being diagnosed with PTSD and Mother acknowledged that he had no such diagnosis.

**{¶30}** Col.G. has been diagnosed with Asperger's Syndrome, OCD, ADHD, and Trichotillomania. Dr. Tener testified that Father was better suited to meet Col.G.'s needs with his "parental style" and "parental awareness of [Col.G.'s] needs." Dr. Tener stated that Col.G.'s progress in the recent weeks did not change her conclusion. Dr. Tener opined that "the needs of [Col.G.], especially at this time in his life, can be managed most appropriately by [Father], and that it is in [Col.G.'s] best interests to reside in [Father's] care and custody."

**R.C. 3109.04(F)(1)(f), (i)**

**{¶31}** When determining the best interest of the child, the court shall also consider "[t]he parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights" and "[w]hether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court." R.C. 3109.04(F)(1)(f), (i).

**{¶32}** Mother argues that the court erred in finding that Father was more likely to honor court-approved parenting time. The court found that Mother had "failed to follow several Magistrate's Orders that were issued regarding where and when Father's parenting time would occur and failed to accept the changes in parenting time recommended by the Guardian ad Litem, despite a specific court order authorizing the Guardian ad Litem to make such recommended

changes." While it is unclear what orders Mother might have violated, the record still supports the court's conclusion that Father is more likely to honor and facilitate visitation.

{¶33} In December 2010, Mother filed an emergency ex parte motion to suspend Father's visitation just hours before the scheduled exchange. In her motion, Mother alleged that Col.G. was pulling out his eyelashes and eyebrows because of "stress related [ ] to the upcoming scheduled companionship time with [ ] [F]ather." Mother additionally alleged that Cod.G. was vomiting due to stress of the upcoming visit with Father. Mother failed to inform the court that the children had been suffering from these conditions off and on for years.[5] In support of her motion, Mother attached a letter from Dr. Karas which stated that Father suffered from "significant post-traumatic stress disorder." Mother disputes that she told Dr. Karas this, but acknowledges that she knew this to be false based on a letter sent to her attorney back in 2006 or 2007.

{¶34} Dr. Tener testified that Cod.G. told her that Mother had restricted Father's contact with him and his siblings. Dr. Tener testified that Mother had told her that Mother sometimes would not allow the children to answer the phone during Father's scheduled phone visitation time. According to Dr. Tener, Mother said that if the kids were eating or involved in other activities, she would let Father's call go to voicemail.

{¶35} Dr. Tener further testified that he was concerned with Mother's rigid adherence to the visitation schedule. Specifically, Dr. Tener referred to a time when Mother refused to allow Father to pick the children up early from after school care. Father had travelled the five hours from his home in Michigan to spend the weekend in Ohio with the children and asked to pick the

---

[5] Mother testified that Col.G. had been pulling out his eyelashes for years, but that the plucking of his eyebrows began in December 2010. Mother testified that Cod.G. had been suffering from vomiting spells for approximately two years.

children up early from the after care program. Mother explained to Dr. Tener that she did not allow father to pick the kids up early because she saw this as "[her] time" even though the children were not with her.

**The GAL's Recommendations**

{¶36} The GAL submitted an initial report and recommendation in November 2011 in which she recommended that Father be the residential parent of Col.G. In her report, the GAL noted that each time she asked Col.G. where he wanted to live, Col.G. "always used the word 'prefer'" in his response. According to the GAL, Col.G. told her that he preferred to live with Mother. The GAL thought this "word choice was odd for a 13 year old and it [was] odd that Mother used the same word" when telling Dr. Tener that the children would "prefer" to live with her. In support of her recommendation that Father have primary custody, the GAL cited several concerns she had with Mother. Specifically, the GAL was concerned that Mother was: (1) making unilateral decisions regarding medical professionals in Col.G.'s life and not keeping Father informed; (2) fostering dependency in Col.G.; and (3) not consistent with follow-through on evaluations and with counseling which "may be contributing to [Col.G.'s] special needs."

{¶37} On March 5, 2012, the GAL filed a supplemental report changing her recommendation. In her supplemental report, the GAL recommended Mother remain as the residential parent of Col.G. In support of her change in recommendation, the GAL cited to: (1) Col.G.'s recent progress in school; (2) Mother's apparent recognition that she was enabling her children; (3) Mother's improved communication with Father; and (4) Col.G.'s progress with his new therapist and psychiatrist. However, the GAL expressed concern about whether Mother had really changed or whether she was just "getting onboard because the [c]ourt proceedings are still hovering over her." Still, the GAL recommended that Col.G. remain with Mother because there

are concerns that if Col.G. is "taken to Michigan, he will not have the same kind of support he is receiving at this time." The GAL explained that the school had a good grasp of both Col.G.'s and Mother's strengths and weaknesses. However, as discussed above, Col.G. would not be attending the same school in the fall of 2012 regardless of whether he remained with Mother or moved to Michigan with Father.

**Other factors**

{¶38} There was evidence that Mother unilaterally changed Col.G.'s counselors and doctors without informing Father. The GAL testified that she was concerned when Mother changed Col.G.'s counselor shortly after the counselor recommended Father be granted unsupervised visitation. According to the GAL, Mother had a history of doing this. Mother testified that she changed counselors because of numerous billing errors and cancelled appointments. Mother admits that she did not inform Father of her decision to change counselors until he contacted her for the information.

{¶39} Dr. Tener and the GAL expressed concerns about Mother's perception of things. For example, Mother testified that Cod.G. was doing "really great" in school, except for Latin. However, she later admitted that from January 4, 2012 to March 30, 2012, Cod.G. had missed 18 days of school and had been tardy 11 times. Further, as of March 30, 2012, Cod.G. was receiving two Fs, a D+, a C-, and an A in his courses. The GAL remarked in her initial report that Mother had represented to her that Cod.G. "had been an Honor Student and recently had just been getting 'OK' grades." When the GAL reviewed Cod.G.'s school records, it showed he had not been doing well in school for a long time.

{¶40} The GAL expressed an additional concern when Mother told Father that Cod.G. was required to attend summer school to repeat a class he had failed so that he could graduate on

time. Summer school interfered with Father's planned visitation. However, when the GAL called the school she was told that Cod.G. did not have to take the class over the summer. Instead, he could take an extra class in the fall. After discussions, Cod.G. said he would prefer to take it over the summer and Father acquiesced. However, the GAL was concerned with the way Mother expressed summer school as a requirement to Father.

{¶41} In her initial report, the GAL noted Mother's lack of communication with Father. Mother seemed to view the duty to keep Father informed as everyone else's. Specifically, the GAL referenced a time in which Father's visitation was rescheduled so that the GAL could conduct a home visit in Michigan. Mother did not inform the children of the change and seemed surprised that Father did not tell them even though the children were living with her. Mother testified that generally she did not inform Father when the school contacted her regarding issues with the children. According to Mother, she believed the school was in contact with Father.

{¶42} Despite the testimony of the progress Col.G. had made in the weeks prior to the hearing, we cannot conclude that the court abused its discretion when it determined that it was in Col.G.'s best interest to reside with Father. Therefore, Mother's assignment of error is overruled.

{¶43} To the extent that Mother argues the court erred in calculating Father's income, she has not assigned this as an error; therefore, we decline to address it. *See* App.R. 12(A)(2).

III

{¶44} Mother's sole assignment of error is overruled. The judgment of the Medina County Court of Common Pleas, Domestic Relations Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETH WHITMORE
FOR THE COURT

HENSAL, P. J.
MOORE, J.
CONCUR.

APPEARANCES:

DAVID C. SHELDON, Attorney at Law, for Appellant.

KENNETH L. GIBSON and MORA LOWRY, Attorneys at Law, for Appellee.