[Cite as *Harrison v. Lewis*, 2017-Ohio-275.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

GREGORY B. HARRISON

    Appellee

    v.

MARLETTA LEWIS

    Appellant

C.A. No. 28114

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No. 2006-02-0356

DECISION AND JOURNAL ENTRY

Dated: January 25, 2017

WHITMORE, Judge.

{¶1} Defendant-Appellant, Marletta Lewis ("Mother"), appeals from the judgment of the Summit County Court of Common Pleas, Domestic Relations Division. This Court affirms in part and reverses in part.

I

{¶2} Mother and Plaintiff-Appellee, Gregory Harrison ("Father"), never married, but had two sons together: J.H., who was born in 1999, and W.H., who was born in 2002. In 2006, Father filed a complaint to establish a parent-child relationship with his sons, and the parties ultimately entered into a shared parenting plan. The plan named both parties residential parents and legal custodians and provided that the children would live together at one parent's house each week and rotate at week's end. The plan remained in place until 2010 when Mother filed a motion to modify the companionship schedule.

{¶3} As a result of Mother's motion to modify, the court referred the matter to Family Court Services for an evaluation and appointed a guardian ad litem for the children. The guardian ad litem ultimately recommended that Mother receive custody of both children. Before a formal hearing could occur, the parties informed the court that they had agreed to adopt the guardian's recommendations. Consequently, the court issued an agreed judgment entry. The agreed entry named Mother the custodial parent and provided that Father would have companionship with both children, pursuant to the court's standard order.

{¶4} In early January 2014, an event occurred while both children were at their maternal grandmother's house along with Mother and their uncle. The event led Father to file a motion for legal custody of W.H. as well as a motion for an emergency ex part order, granting him temporary custody of W.H. It was Father's position that J.H. was a danger to W.H. and that Mother was no longer able to protect W.H. from J.H.'s violent outbursts. As a result of Father's motion, the court awarded temporary custody of W.H. to Father. The court's order provided that Mother would have standard order companionship with W.H., but that J.H. could not be present during those visits. The court again referred the matter to Family Court Services for an evaluation and appointed a guardian ad litem for the children. The court also later appointed an attorney to represent the children.

{¶5} Due to a series of continuances and other scheduling matters, a hearing on Father's motion for legal custody did not take place until February 2015. The hearing took place before a magistrate over two days, the second day of which occurred in May 2015. Mother, Father, the children's maternal uncle, and the guardian ad litem all testified at the hearing where there was extensive testimony about J.H.'s behavior and Mother's ability to control him. The guardian ad litem ultimately recommended that Father receive custody of W.H. and Mother

receive custody of J.H. The guardian also recommended, however, that both boys spend time together with each parent during the month.

{¶6} In July 2015, the magistrate issued her decision in which she awarded custody of W.H. to Father and custody of J.H. to Mother. Her decision further provided that "[v]isitation shall be exercised by agreement of the parties." Mother filed several objections to the magistrate's decision, and Father filed a response to her objections. In January 2016, the court issued its ruling on Mother's objections. The court determined that W.H. should remain in Father's custody and J.H. should remain in Mother's custody, so it overruled Mother's objections in that regard. The court agreed, however, that the magistrate had erred by failing to establish a companionship schedule. The court ordered that both parents "should have every other weekend parenting time except one weekend per month when both children should be with [Mother] and one weekend per month when both children should be with [Father]."

{¶7} Mother now appeals from the trial court's judgment and raises five assignments of error for our review. For ease of analysis, we consolidate several of the assignments of error.

II

Assignment of Error Number One

THE TRIAL COURT ERRED IN DETERMINING THAT THERE HAD BEEN A CHANGE OF CIRCUMSTANCES OF SUFFICIENT SIGNIFICANCE TO SUPPORT THE MODIFICATION OF THE PRIOR CUSTODY ORDER ENTERED IN 2010.

Assignment of Error Number Two

THE TRIAL COURT ERRED IN DETERMINING THAT THE MAGISTRATE'S EXCLUSION OF EVIDENCE CRITICAL TO THE THRESHOLD ISSUE OF CHANGED CIRCUMSTANCES WAS HARMLESS ERROR.

{¶8} In her first assignment of error, Mother argues that the trial court erred when it found that a sufficient change in circumstances had occurred to support a modification of the parties' prior custody order. In her second assignment of error, she argues that the court erred when it found harmless the magistrate's decision to exclude certain evidence aimed at showing that a change of circumstances had not occurred. We disagree with both propositions.

{¶9} Generally, this Court reviews a trial court's action with respect to a magistrate's decision for an abuse of discretion. *Fields v. Cloyd*, 9th Dist. Summit No. 24150, 2008-Ohio-5232, ¶ 9. "In so doing, we consider the trial court's action with reference to the nature of the underlying matter." *Tabatabai v. Tabatabai*, 9th Dist. Medina No. 08CA0049-M, 2009-Ohio-3139, ¶ 18. This Court may not overturn the trial court's judgment regarding the allocation of parental rights and responsibilities unless the trial court was arbitrary, unreasonable, or unconscionable in its determination. *Graves v. Graves*, 9th Dist. Medina No. 3242-M, 2002-Ohio-3740, ¶ 31, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "Moreover, this Court must affirm the factual conclusions of the trial court unless they are not supported by competent, credible evidence." *Maxwell v. Maxwell*, 9th Dist. Wayne No. 07CA0047, 2008-Ohio-1324, ¶ 6. *See also Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 11-12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386-387 (1997).

{¶10} A court shall not modify a prior custody decree

unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child[ or] the child's residential parent * * *, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree * * *, unless a modification is in the best interest of the child and * * * [t]he harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.

R.C. 3109.04(E)(1)(a)(iii). "The threshold determination is whether there has been a change of circumstances * * *." *Sysack v. Ciulla*, 9th Dist. Medina No. 15CA0047-M, 2016-Ohio-3380, ¶ 6. "The change in circumstances must be one of substance, not merely a slight or inconsequential change." *Goad v. Goad*, 9th Dist. Medina No. 13CA0097-M, 2014-Ohio-3534, ¶ 12, citing *Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997). "The clear intent of [the] statute is to spare children from a constant tug of war between their parents who would file a motion for change of custody each time the parent out of custody thought he or she could provide the children a 'better' environment." *Davis* at 418, quoting *Wyss v. Wyss*, 3 Ohio App.3d 412, 416 (10th Dist.1982).

{¶11} There is no dispute that, in 2010, both parties agreed that Mother would take custody of both J.H. and W.H. Father testified that he decided to seek custody of W.H. in 2014 because he became concerned for W.H.'s safety, as well as the safety of J.H. He testified that there had been several "incidents of violence" while the boys were in Mother's custody and that those incidents were becoming "more frequent and more severe." He stated that the last incident that precipitated his filing for custody occurred at the beginning of January 2014.

{¶12} At the beginning of January 2014, Father received a phone call from the boys' maternal uncle, asking for Father's help with J.H. Father learned that both boys were at their maternal grandmother's house, along with their uncle and Mother, when a fight broke out. He learned that the boys' uncle had stepped in to restrain J.H. and, during the incident, had broken his hand and injured his knee. According to Father, he could hear yelling and screaming over the phone, as well as J.H. cussing. He further testified that, after the incident, W.H. showed him that he had marks on his neck from J.H.

{¶13} The boys' uncle also testified regarding the January incident. The uncle testified that J.H. became upset when he learned that certain electronics at his grandmother's house would not be set up that day. He stated that J.H. insulted his grandfather and then ran outside when his grandfather chastised him. The uncle followed J.H. into the cold, but left him outside because J.H. was angry. When J.H. later wanted to come inside to get his belongings, the uncle informed him that he would not be getting anything until he apologized. The situation escalated when J.H. attempted to push past his uncle, and the two "tussled." The uncle testified that, during the tussle, he slipped on the floor and broke his hand. After the incident, he also learned that J.H. had pushed W.H. and that W.H. had fallen down. According to the uncle, J.H. was not responsive to anyone during the incident and had to be physically restrained. The uncle admitted that the January incident was not the first time that J.H. had experienced a violent outburst. He testified, however, that he frequently spent time around both boys and he had never seen one harm the other in a way that left marks on either boy.

{¶14} Father testified that, within the past few years, J.H. has spent time in a psychiatric facility on several occasions. On one of those occasions, which occurred in 2013, J.H. had to be admitted to a psychiatric hospital because he threatened to commit suicide while he was at school. Father testified that, in March 2013, he had to retrieve J.H. from a juvenile detention facility because he was arrested on a charge of domestic violence related to Mother. Further, he testified that, at some point after May 2013, he had to break up a fight between J.H. and W.H. During that incident, Father and Mother were talking outside, and W.H. ran out of the house with J.H. chasing him. Father attempted to separate the boys, but W.H. ran back inside and J.H. followed. By the time Father ran inside, the boys were at the bottom of the stairs fighting, and he had to pull them apart. J.H. then ran downstairs, and Father followed. According to Father, J.H.

grabbed a pool stick and was going to hit him with it. Father then grabbed the pool stick from J.H. and physically restrained him. He testified that J.H. and W.H. fight violently and that W.H. has sustained scratches on his arms following their fights.

{¶15} Father testified that, following his hospitalization, J.H. was placed on medication and put into counseling, and Mother was given a safety plan to help address J.H.'s behavior. Father testified, however, that Mother did not follow the safety plan. For example, although the safety plan instructed Mother to call the police when J.H. became uncontrollable, Father testified that either Mother or J.H.'s uncle routinely called him and asked him to come help control J.H. He testified that J.H. was no longer in counseling or taking his medication and was currently "out of control."

{¶16} Father agreed that J.H. has suffered from behavioral problems for a long time, but testified that additional issues have become apparent since 2010. He further testified that the situation had begun to affect W.H. because W.H. had begun to show aggressive behaviors. Father specified that W.H.'s grades had gradually declined and that he had received school suspensions in 2011, 2012, and 2013. Father testified that the 2013 suspension was for gross insubordination because W.H. had put his hands on a teacher. According to Father, he felt there was a high probability that either W.H. or J.H. would be injured if they remained together because, currently, J.H. represents a danger to W.H. and W.H. "knows how to get under [J.H.'s] skin." Father repeatedly indicated that he was concerned for W.H.'s safety, as well as J.H.'s., and that he felt a change of custody was necessary to protect them both.

{¶17} Mother testified that she has been the primary caretaker of the boys since birth and that, since 2010, Father has exercised his companionship time with his sons only "[s]poradically" and "[i]nconsistently." Mother admitted that J.H. has been diagnosed with

ADHD combined type, mood disorder not otherwise specified, anxiety disorder, and oppositional defiant disorder. She testified, however, that J.H.'s behavioral problems were not a new issue and that he was first diagnosed when he was about six or seven years old. Mother agreed that J.H. experienced a violent outburst in January 2014 and that, as a result of the incident, J.H.'s uncle was injured. Yet, she testified that she never knew J.H. to physically harm W.H. She agreed that the two would argue and would sometimes fight one another, but denied that the fighting resulted in any injuries. She testified that the fights have never caused her to be concerned for W.H.'s safety.

{¶18} Mother admitted that she received a safety plan following J.H.'s hospitalization and that she did not always follow the plan's recommendations. She stated, however, that she always considered the entirety of the circumstances in choosing a proper course of action and always acted in the best interests of her children. Mother admitted that she sometimes called her brother for help. She further admitted that, between 2010 and 2014, J.H.'s actions caused her to contact the police on two occasions. On one of those occasions, J.H. was taken into custody for domestic violence. Mother specified that she called the police because J.H. shoved her when she intervened during a fight between him and W.H. She once again denied, however, that W.H. was injured during the incident. Mother acknowledged that she never placed W.H. in counseling, but stated that she never felt it was necessary for W.H. to receive counseling.

{¶19} At multiple points during the hearing before the magistrate, Mother's counsel attempted to introduce testimony and evidence about the proceedings that took place in 2010. It was Mother's position that the parties had reached their agreement in 2010 with full knowledge of J.H.'s behavioral difficulties and, therefore, Father could not show that a change in circumstances had occurred. The magistrate, however, refused to allow evidence about the

discussions that the parties had in 2010. The magistrate also refused to allow Mother to introduce the guardian ad litem's recommendations from 2010.

{¶20} Mother ultimately proffered both the guardian ad litem's 2010 recommendations and the 2010 recommendations that the parties received from Family Court Services. The guardian ad litem's report from 2010 notes that J.H. would benefit from "more comprehensive mental health services" and that both parties should "participate actively in [his] mental health treatment." Likewise, the report from Family Court Services acknowledges that J.H. has "behavioral issues and mental health needs." Even so, neither document refers to any specific violent episodes involving J.H.

{¶21} The trial court determined that a substantial change in circumstances had occurred since the parties reached their custody agreement in 2010. Although the court found that the magistrate had erred by not allowing Mother to introduce her evidence regarding the 2010 proceedings, it determined that the error was harmless. The trial court found that, while the parties and the court had known that J.H. suffered from mental health issues in 2010, the evidence showed that his behavior had changed since then. The trial court specifically found that J.H. was "bigger, stronger and more violent than he was in 2010" and that he was "now more of a threat to [his brother]." Consequently, it concluded that a substantial change of circumstances had occurred.

{¶22} Mother's argument on appeal is two-fold. First, she argues that the court erred when it found a substantial change of circumstances had occurred because a change of circumstances cannot be based on information that was known to the court at the time of the prior custody order. Mother argues that the court was aware of J.H.'s behavioral issues when it awarded her custody of both children in 2010. According to Mother, there was no evidence that

J.H. had ever hurt W.H., so J.H.'s long-standing behavioral issues could not form the basis of a change of circumstances finding. Second, Mother argues that the court erred when it found harmless the magistrate's decision to exclude evidence about the 2010 proceedings from the hearing. Mother argues that the evidence, particularly the former guardian ad litem's recommendations, show that the parties and the court knew about J.H.'s behavioral issues in 2010. According to Mother, the evidence was critical to understanding that no change of circumstances had occurred.

{¶23} We agree with the trial court's determination that, while the magistrate erred by not allowing Mother to introduce evidence from the 2010 proceedings, that error was harmless. As noted, Mother proffered the 2010 recommendations from the guardian ad litem and the Family Court Services evaluator. Although both documents clearly reference J.H. having behavioral issues, neither one identifies any specific, violent episodes involving J.H. The testimony at trial was that J.H. had suffered from behavioral issues for a substantial period of time, having first been diagnosed at the age of six or seven. Yet, his behavioral issues, by themselves, were not the cause of the trial court's change of circumstances determination. The court reached its determination because J.H.'s *behavior* had become more violent. There was evidence that he had been repeatedly hospitalized for psychiatric treatment and had engaged in several specific, violent outbursts since 2010, all of which occurred in W.H.'s presence. It was that evidence that led the trial court to conclude that a substantial change of circumstances occurred. Accordingly, Mother has not shown that additional evidence about the fact that J.H. suffered from behavioral issues in 2010 would have changed the result in this matter. *See, e.g., Sypherd v. Sypherd*, 9th Dist. Summit No. 25815, 2012-Ohio-2615, ¶ 19; *Hutchison v.*

*Henderson*, 9th Dist. Summit No. 20862, 2002-Ohio-4521, ¶ 47. Her second assignment of error lacks merit.

{¶24} With regard to the court's change of circumstances determination, we note that "a trial court has wide latitude in determining whether a change has occurred * * *." *In re C.F.*, 9th Dist. Wayne No. 14AP0053, 2015-Ohio-5537 ¶ 6, citing *Davis*, 77 Ohio St.3d at 418. Mental health issues can lead to a change of circumstances determination. *Goad*, 2014-Ohio-3534, at ¶ 15. Although the parties and the court were aware of J.H.'s behavioral issues at the time of their 2010 custody agreement, there was no evidence that, before 2010, J.H. had ever been repeatedly hospitalized for psychiatric treatment or had engaged in repeated, violent outbursts in the presence of W.H. *See In re C.F.* at ¶ 9 (court acted within its discretion in finding change of circumstances where father's depression, while known to the parties at the time of the prior decree, had escalated to the point where hospitalization was required and he was self-harming). There was testimony that J.H. had engaged in physical altercations with W.H., Father, Mother, and his uncle. There also was testimony that his behavior caused Mother to contact the police on at least two occasions and led to his uncle breaking his hand. While Mother testified that J.H. had never hurt W.H., she admitted that they would fight with one another. Further, the uncle testified that J.H. shoved W.H. on at least one occasion, and Father testified that he saw marks on W.H.'s neck following that same occurrence. Father also testified that W.H. sustained scratches to his arms following fights with J.H. To the extent there was conflicting testimony about whether J.H. had ever injured W.H., the lower court was in the best position to evaluate the credibility of the witnesses. *See In re T.A.*, 9th Dist. Lorain Nos. 15CA010858 & 15CA010859, 2016-Ohio-5552, ¶ 10.

{¶25} The court heard testimony that W.H. repeatedly witnessed J.H.'s outbursts and, at times, triggered his outbursts by teasing him. The court also heard testimony that W.H.'s grades had gradually declined and that he had received at least three school suspensions since 2010, the last of which occurred when he put his hands on a teacher. There was evidence that neither W.H., nor J.H. were in counseling, that J.H. was no longer taking medication for his behavioral issues, and that Mother was not following the safety plan recommendations that she received following J.H.'s 2013 hospitalization. The court heard testimony that J.H. was "out of control" and that there was a concern, at least on the part of Father, that W.H. would be injured if he remained in his Mother's custody along with his brother. Having carefully reviewed the entire record, we cannot conclude that the court abused its discretion when it found that a substantial change of circumstances had occurred since 2010. Consequently, Mother's first assignment of error is overruled.

## Assignment of Error Number Three

THE TRIAL COURT ERRED IN DETERMINING IT WAS IN THE BEST INTERESTS OF THE PARTIES' YOUNGER SON TO LIVE WITH HIS FATHER AND NOT WITH HIS MOTHER AND OLDER BROTHER.

{¶26} In her third assignment of error, Mother argues that the trial court abused its discretion when it concluded that it was in W.H.'s best interests to be in Father's custody. We do not agree.

{¶27} As previously noted, we generally review a trial court's action on a magistrate's decision for an abuse of discretion, *Fields*, 2008-Ohio-5232, at ¶ 9, but do so "with reference to the nature of the underlying matter." *Tabatabai*, 2009-Ohio-3139, at ¶ 18. "[A]bsent an argument that the trial court reached an incorrect factual determination on one or more of the best interest prongs, this Court will review a trial court's best interest analysis under an abuse of

discretion standard of review." *Walsh-Stewart v. Stewart*, 9th Dist. Wayne No. 12CA0031, 2012-Ohio-5927, ¶ 20. An abuse of discretion implies that "the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore*, 5 Ohio St.3d at 219.

{¶28} "When determining the best interest of the child, R.C. 3109.04(F)(1) requires the trial court to consider 'all relevant factors' that include, but are not limited to, enumerated factors contained in the statute." *I.C.-R. v. N.R.*, 9th Dist. Summit No. 27671, 2016-Ohio-1329, ¶ 40, quoting R.C. 3109.04(F)(1). Relevant to this appeal, those factors are:

> (a) The wishes of the child's parents regarding the child's care;
>
> (b) If the court has interviewed the child * * * the wishes and concerns of the child, as expressed to the court;
>
> (c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
>
> (d) The child's adjustment to the child's home, school, and community;
>
> (e) The mental and physical health of all persons involved in the situation; [and]
>
> (f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights * * *.

R.C. 3109.04(F)(1). "[T]he trial court has discretion to assign weight to the relevant best interest of the child factors depending upon the facts before the court." *I.C.-R. v. N.R.* at ¶ 48.

{¶29} Apart from the testimony outlined in Mother's previous assignments of error, the lower court also heard testimony from the guardian ad litem assigned to conduct an evaluation in this matter. James Brightbill testified that he spoke with Mother, Father, W.H., and J.H. independently, conducted visits with each boy at Mother's and Father's homes, reviewed the Family Court Services file from the 2010 proceedings, and spoke to school officials for both boys. He testified that, on the day he visited J.H.'s school as part of his investigation, he learned

that J.H. had just been suspended for throwing a chair at another student. Brightbill indicated that his investigation disclosed that J.H. "really struggles with some behavioral issues."

{¶30} Brightbill testified that when both boys lived with Mother there were "ongoing behavioral problems, ongoing conflicts between the children, conflicts in [Mother's] home, [and] conflicts at school." He described Mother's home as a "high conflict home" when she and both boys were living there. He also agreed that he had concerns about Mother's ability to deescalate conflicts between the boys when they arose.

{¶31} Brightbill testified that it was W.H.'s wish to return to Mother's home, but that Father's home provided him with a more structured environment. He testified that W.H.'s grades were still poor, but that his principal felt he was making progress academically. Brightbill testified that W.H.'s behavior had improved since moving to Father's house and that he had only experienced a few very minor incidents at school. According to Brightbill, W.H.'s principal gave him "[v]ery glowing reports" about W.H.'s behavior since living with Father, as did a volunteer who worked with W.H. at his Boys and Girls Club. While Brightbill acknowledged that Father was very busy and often had to be away from home, he testified that Father made sure W.H. was completing his assignments and attending all of his evening practices for sports. He further testified that Father was actively involved in communicating with W.H.'s teachers and school.

{¶32} Brightbill stated that both W.H. and J.H. had a desire to see one another and that, since Father had gained temporary custody of W.H., the boys had spent a significant amount of time apart. He testified that it was in their best interest to have time together, but acknowledged that the potential for conflict existed when they were in the same household. Brightbill stated that he was hopeful the potential for conflict would be reduced if both boys spent time together

in Father's more structured household. He ultimately recommended that Mother retain custody of J.H. and Father receive custody of W.H., but that both boys spend time together at each parent's home. Specifically, Brightbill recommended that both boys spend one full week together at Mother's home and one full week together at Father's home each month, in addition to having their separate parenting time with their non-custodial parent.

{¶33} Father acknowledged that W.H.'s grades were still poor and that he had asked the school to have W.H. repeat his current grade. Father testified that he did so because W.H.'s reading was not on par with his grade level and that W.H., who was previously at a public school when he was with Mother, was struggling with the reading and the additional assignments at his new parochial school. Father testified that W.H. was receiving tutoring and that he would help W.H. with his homework. He confirmed that he kept in contact with W.H.'s teachers and principal regarding W.H.'s behavior and progress. There also was testimony that Father had put W.H. into counseling.

{¶34} As noted, Father believed that there was a high probability that either W.H. or J.H. would be injured if they lived together because J.H. was "out of control." It was his opinion that the boys should remain apart until a plan to address J.H.'s behavior was put in place and followed. Father testified that J.H. was not currently in counseling or taking medication for his behavioral issues. He repeatedly indicated that J.H. lacked a structured environment because Mother would not adhere to any plan that J.H.'s former counselors attempted to put into place in order to address his behavior. He emphasized that he was seeking custody of W.H. for his protection, as well as the protection of J.H.

{¶35} According to Mother, W.H. had a few poor grades before Father gained temporary custody of him, but he performed relatively well in school and had never had to repeat

a grade before. Mother testified that Father changed W.H.'s school without telling her and that, before the hearing, she was not aware that Father planned on holding W.H. back a year in school. She stated that, since Father gained temporary custody, he had made it difficult to arrange any visits between the boys and that the boys went almost a year without seeing one another. Mother admitted that J.H. and W.H. argued when they were together and had hit each other in the past, but denied that J.H. had ever harmed W.H. or that he was a danger to W.H.

{¶36} Mother testified that she never sought counseling for W.H. She also acknowledged that, when W.H.'s former school attempted to send him to counseling at school, she intervened. According to Mother, the school legally had no right to remove W.H. from class without her permission, so she objected to the counseling. She testified that the school needed to have her permission on file before attempting to counsel her son and that she was not aware what type of counseling he was receiving. Mother confirmed that she did not feel that W.H. needed counseling.

{¶37} Having reviewed the record, we cannot conclude that the trial court abused its discretion when it determined that it was in W.H.'s best interests to be in Father's custody. Although W.H. expressed a desire to live with Mother, there was evidence that Father had provided him with a stable living environment and that he had made improvements while residing there. W.H.'s school officials reported that his behavior had improved and, unlike the prior three years, he had not received any suspensions. While W.H.'s grades had further declined, there was testimony that he had transitioned to a school with a more rigorous curriculum. There also was testimony that W.H. was being held back a year because Father had made that request. According to Father, W.H. struggled with reading comprehension, but his principal felt that he was progressing academically. There was testimony that Father had

fostered W.H.'s involvement in several extracurricular activities and had placed him in counseling.

**{¶38}** Although the guardian ad litem acknowledged that W.H. and his brother wanted to be together, he recommended that the two reside in separate households because of the potential for conflict. There was evidence that Mother had difficulty controlling the boys when they fought, and the guardian specifically testified that Mother's home was a "high conflict home" when both boys were present there. There is no dispute that, when W.H. lived with Mother, he either witnessed or was directly involved in several, violent episodes due to J.H.'s behavioral issues. Based on all of the foregoing, we cannot say that the trial court's decision to have W.H. remain in Father's custody was unreasonable, arbitrary, or unconscionable. *See Walsh-Stewart*, 2012-Ohio-5927, at ¶ 20. Accordingly, Mother's third assignment of error is overruled.

Assignment of Error Number Four

THE TRIAL COURT ERRED IN REJECTING THE GUARDIAN AD LITEM'S RECOMMENDATION THAT, IF FATHER OBTAINS THE CUSTODY OF [W.H.], THE BOYS LIVE TOGETHER ONE WEEK A MONTH WITH THEIR MOTHER AND ONE WEEK A MONTH WITH THEIR FATHER.

Assignment of Error Number Five

THE TRIAL COURT ERRED IN DENYING MOTHER STANDARD-ORDER VISITATION WITH HER YOUNGER SON.

**{¶39}** In her fourth assignment of error, Mother argues that the trial court abused its discretion when it rejected the guardian ad litem's recommendation that her sons spend one full week together with Mother and one full week together with Father each month. In her fifth assignment of error, she argues that the court erred by denying her standard order visitation with W.H. For the reasons set forth below, we agree with both propositions.

**{¶40}** As previously noted, we generally review a trial court's action on a magistrate's decision for an abuse of discretion, *Fields*, 2008-Ohio-5232, at ¶ 9, but do so "with reference to the nature of the underlying matter." *Tabatabai*, 2009-Ohio-3139, at ¶ 18.

> [R.C.] 3109.051 governs a trial court's decisions as to visitation. *Braatz v. Braatz*, 85 Ohio St.3d 40, 44 (1999); R.C. 3109.12(B). "When a trial court determines parenting time under R.C. 3109.051, it must do so consistent with the best interests of the children involved with consideration of the factors mentioned in R.C. 3109.051(D)." *Pirkel v. Pirkel*, 9th Dist. Lorain No. 13CA010436, 2014-Ohio-4327, ¶ 9. In order to further a child's best interests, the court has the discretion to limit or restrict visitation rights, including "the power to restrict the time and place of visitation, to determine the conditions under which visitation will take place and to deny visitation rights altogether if visitation would not be in the best interests of the child." *Marrero v. Marrero*, 9th Lorain No. 02CA008057, 2002-Ohio-4862, ¶ 9, quoting *Anderson v. Anderson*, 147 Ohio App.3d 513, 2002-Ohio-1156, ¶ 18 (7th Dist.). "We review a decision regarding parenting time for an abuse of discretion." *Pirkel* at ¶ 9.

*In re C.F.*, 2015-Ohio-5537, at ¶ 16. An abuse of discretion implies that "the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore*, 5 Ohio St.3d at 219.

**{¶41}** Brightbill, the guardian ad litem in this matter, recommended that Mother retain custody of J.H. and Father receive custody of W.H., but that both boys spend time together at each parent's home. Specifically, he recommended that both boys spend one full week together at Mother's home and one full week together at Father's home each month, in addition to having their separate parenting time with their non-custodial parent. The trial court ultimately rejected Brightbill's recommendation as to the amount of time the boys should spend together. Instead, it ordered the boys to spend one weekend per month with Mother and one weekend per month with Father. It further awarded Mother "every other weekend parenting time" with W.H.

**{¶42}** Mother argues that the court erred by issuing a visitation order that deprives her of standard order visitation with W.H. because there is no evidence that she is a threat to his safety or well-being. She further argues that the court erred by not following Brightbill's

recommendation regarding the boys because there is no evidence that J.H. ever caused W.H. any actual harm or is responsible for his academic difficulties

{¶43} We are mindful that a trial court has full discretion to limit visitation rights and to make a visitation determination, consistent with the best interests of the child or children at issue. *See In re C.F.* at ¶ 16. The trial court's judgment entry here, however, is devoid of any reference to R.C. 3109.051 or the statutory factors contained therein. The trial court did not give any indication as to why it did not award Mother the additional time associated with its standard order, particularly when she had been awarded that time on a temporary basis throughout these proceedings. It also did not give any indication why it chose to reject the guardian ad litem's recommendation that the boys visit with each parent for a full week each month. Because the record does not support the conclusion that the court considered R.C. 3109.051 in reaching its ultimate determination, we cannot say whether it abused its discretion. Instead, we must vacate the court's judgment entry to the extent that it addresses visitation and remand this matter for further proceedings. Upon remand, the court must consider the factors set forth in R.C. 3109.051(D) in reaching its determination on visitation. Mother's fourth and fifth assignments of error are sustained on that basis.

### III

{¶44} Mother's fourth and fifth assignments of error are sustained. Her remaining assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Domestic Relations Division, is affirmed in part, reversed in part, and remanded for further proceedings, consistent with the foregoing opinion.

Judgment affirmed in part,
reversed in part,
and cause remanded.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

BETH WHITMORE
FOR THE COURT

CARR, P. J.
SCHAFER, J.
CONCUR.

APPEARANCES:

TERENCE E. SCANLON, Attorney at Law, for Appellant.

LESLIE S. GRASKE, Attorney at Law, for Appellee.