[Cite as *Morrow v. Becker*, 2018-Ohio-3316.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

| | | |
|---|---|---|
| JEFFREY S. MORROW | | C.A. No. 17CA0002-M |
| Appellant | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| SHERRI BECKER | | COURT OF COMMON PLEAS COUNTY OF MEDINA, OHIO |
| Appellee | | CASE No. 04PA0199 |

DECISION AND JOURNAL ENTRY

Dated: August 20, 2018

CARR, Judge.

{¶1} Plaintiff-Appellant Jeffrey Morrow ("Father") appeals from the judgment of the Medina County Court of Common Pleas, Domestic Relations Division. This Court affirms in part, and reverses in part.

I.

{¶2} The history of this case has been detailed in a prior appeal. *See Morrow v. Becker*, 9th Dist. Medina No. 11CA0066-M, 2012-Ohio-3875, ¶ 2-5; *see also Morrow v. Becker,* 138 Ohio St.3d 11, 2013-Ohio-4542 (affirming this Court's decision). Father and Defendant-Appellee Sherri Becker ("Mother") have never been married, but are the parents of two daughters, who are two years apart in age. The younger daughter was diagnosed with Attention Deficit Hyperactivity Disorder and has Down Syndrome; she has corresponding special needs associated with her diagnoses. She is largely non-verbal and only speaks in two to three-word sentences.

{¶3} The parties have extensively litigated issues related to custody and child support. Throughout the litigation, Mother has been the residential parent and Father was awarded varying amounts of parenting time. Relevant to the instant appeal, in 2014, Father filed a motion seeking the reallocation of parental rights and responsibilities and a modification of child support. Father asked the trial court to name him the residential parent or to institute shared parenting. Father maintained that the older daughter had expressed a desire to live with Father, that Mother failed to consider the older daughter's wishes, including her desire to remain in private school, that Mother had an alcohol problem, and that Father was fostering both children's development. Mother filed a motion to modify Father's parenting time.

{¶4} While the older daughter did initially express a wish to reside with Father, she changed her mind in the summer of 2015, prior to the final hearing. Prior to a softball trip, the older daughter expressed to the guardian ad litem that she no longer wanted to live with Father but was afraid to say anything because doing so would be "harmful[.]" Then, during the softball trip to Tennessee, Father discovered that the older daughter had inappropriate photos on her cell phone, including one of the older daughter smoking and one in which she is wearing minimal clothing. Father also came to discover that the older daughter had inappropriate user names, including "F*ck buddy[,]" and that she was dating a boy, who appears in a photograph hugging her. Mother and the older daughter had not told Father that the older daughter was dating; Father did not approve of her doing so. Mother did not find anything wrong with the older daughter dating, particularly because the older daughter and the boy did not go out alone on dates. Later, Father would discover that the older daughter had a Facebook page on which she claimed to be a high school graduate and a "boss" at Taco Bell, even though she was only in middle school. Father would also notice that Mother was one of the older daughter's friends on Facebook.

{¶5}    Father was angry, shocked, and hurt by what he saw on the phone.  He admitted to yelling at the older daughter and grabbing the front of her shirt right below her chin.  It was alleged that Father shoved the older daughter's face into the windshield; however Father denied doing so.

{¶6}    The older daughter became very upset and ran out of the car and into a store in the mall.  Ultimately, the police were called.  The older daughter refused to go with Father.  The police did not see any reason the older daughter could not be returned to Father's care but told Father that they would have to take the older daughter to juvenile detention if she refused to cooperate.  Ultimately, Father agreed to allow the older daughter to stay with the softball coach and his wife.

{¶7}    The next day the coach and his wife took the older daughter swimming.  After Father thought about it a while, he thought that the older daughter should drive back with him.  Father believed that it was inappropriate to let the older daughter avoid dealing with her problems.  Father went to pick up the older daughter and had a couple of police officers accompany him.  If the older daughter refused to leave with him, he would have her sent to juvenile detention.  The older daughter did eventually agree to go with Father.

{¶8}    The matter was not discussed on the car ride home.  Ultimately, Father did take the phone away from the older daughter for a short period of time.  The older daughter remained in Father's care for the remainder of his visitation.  Upon her return from the trip, the older daughter saw her counselor and the guardian ad litem.  The older daughter disclosed a history of past physical abuse by Father involving both daughters.  The older daughter had also talked to the guardian ad litem during the incident in Tennessee, and the guardian ad litem indicated that the older daughter seemed genuinely afraid of returning with Father.  Mother indicated that

Father had engaged in similar abusive behavior with her during their relationship. Father denied any abuse. Mother also testified that Father told the older daughter she was "a slut and a whore" and told her that he was "never going to trust her" or "love her again" after observing the content on the older daughter's phone. Mother believed that this harmed the older daughter emotionally. Mother averred that she had punished the daughter for the inappropriate user name earlier in the year by grounding her for over a month from the phone and making her close the account. Mother was unaware that she had reinstated the account and noted that the phone was one that Father had provided the older daughter.

{¶9} In light of the older daughter's revelations, the guardian ad litem changed his recommendation. He no longer recommended that Father have increased parenting time with the children and instead asserted that Father should not be granted unsupervised visitation until the allegations could be investigated. The guardian ad litem recommended that the family undergo counseling and that Father not have unsupervised parenting time until the counseling is underway. When asked whether Father should only receive supervised parenting time during the counseling process, the guardian ad litem responded that he would prefer to leave that determination to the professional. In describing Father, the guardian ad litem indicated that Father was "very aggressive and unyielding and very certain that his positions [were] accurate and no one else's [were]." He also stated that Father's personality was "harsh."

{¶10} In August 2015, Mother filed for a domestic violence civil protection order on behalf of herself and the children. An ex parte order was granted. Subsequently, Mother filed a motion in the instant case to suspend Father's parenting time based upon the civil protection order. That motion was also granted.

{¶11} The matter proceeded to a two-day hearing before a magistrate and was followed by an in-camera interview with the older daughter. Following the in-camera interview, the trial court continued the suspension of Father's parenting time pending the final decision. At the hearing, Mother indicated that the younger daughter began hiding when Mother would tell the younger daughter it was time for her to visit with Father. In addition, when they would get to the exchange point, the younger daughter would start crying and saying "No, no, no." Mother testified that this behavior was new and only started occurring in the last two years before the hearing. Mother also testified that the younger daughter's school would report that she would have a "horrible" day at school on the Mondays after she had parenting time with Father. With respect to the older daughter, Mother testified that there had been a recent improvement in the older daughter's mood, there was less arguing, and she was taking responsibility for her actions. Mother attributed this to the older daughter no longer being influenced and manipulated by Father. Mother indicated that the older daughter was very relieved by the issuance of the protection order.

{¶12} Father, however, presented several witnesses who testified that Father had a good relationship with both children and that they enjoyed visiting with Father. Father denied that the younger daughter feared him and believed that the older daughter changed her mind about wanting to live with him because he believed that Mother promised the older daughter that she could keep her boyfriend if she said she wanted to live with Mother. Father expressed concern over whether the younger daughter's development was being appropriately fostered and believed that the older daughter's school behavioral issues occurred because Mother took the daughter out of private school. Father also asserted that Mother had an alcohol problem. Father categorized the counseling the older daughter had been receiving as "psychological abuse" and found it to be

unnecessary. Father also believed that the guardian ad litem was biased against him. Father admitted to informing the older daughter about some of the court proceedings because he believed it was important for her to know about them, but denied telling her everything about the proceedings.

{¶13} On February 18, 2016, the magistrate issued a decision, which was adopted by the trial court that same day. While the magistrate found that there had been a substantial change of circumstances, the magistrate also found that it was in the children's best interest for Mother to remain the residential parent. The magistrate ordered that both parties engage in reunification counseling. Once reunification counseling commenced, Father was to have no less than two hours of supervised parenting time each week and that parenting time would be expanded as recommended by the reunification counselor. Once the reunification counseling was concluded, Father could petition the trial court for a specific order of parenting time. The magistrate additionally found that Father's testimony concerning his income was not credible. The magistrate concluded that Father's actual income was $50,000 but found him voluntarily underemployed and imputed an additional $93,084 in income to him for a total income of $143,084. This amount was similar to Father's 2011 income. The magistrate ordered Father to pay $1,760.58 per month in child support plus a processing charge.

{¶14} Father filed objections and supplemental objections to the magistrate's decision. Therein, Father challenged the magistrate's limitations on Father's parenting time and the requirement of reunification counseling. In addition, Father challenged the finding with respect to Mother's income, argued that the magistrate's finding of Father's voluntary underemployment was not supported by the record, that the magistrate erred in finding that Father's personal expenses were being paid by his employer, and in failing to value those expenses.

{¶15} Following an oral argument hearing on the objections, the trial court overruled the majority of Father's objections. The trial court sustained Father's objection with respect to Mother's income and altered factual findings with respect to Father's income. The trial court found Father's actual income to be $108,421, which included various payments Father's employer made for him including health insurance, cell phone, vehicle insurance, and attorney fees. In addition, after concluding that Mother carried her burden of demonstrating that Father was voluntarily underemployed, the trial court imputed $33,601 in additional income to Father (as opposed to the $93,084 imputed by the magistrate), for a total income of $142,022. The trial court recalculated Father's child support obligation and found it to be $1,714.15 per month plus the processing fee.

{¶16} Father has appealed, raising two assignments of error for our review. Before addressing these assignments of error, the Court is compelled to detail the difficulties encountered in obtaining a complete record. The record on appeal is lengthy, and this Court has reviewed it thoroughly. Unfortunately, upon review, this Court determined that the record was incomplete because necessary documents were not transmitted to the clerk of the Court of Appeals. The defects in the record have caused delay in addressing the merits of this appeal.

{¶17} After review of the record, when this Court determined that there were exhibits and a recorded interview missing, the clerk of the Domestic Relations Court forwarded the missing materials to the clerk of the Court of Appeals to be included in the record on appeal. Pursuant to this Court's Magistrate's Order, the record was supplemented with materials from the trial court's confidential file, including, as relevant to addressing the assignments of error on appeal, the guardian ad litem reports and in-camera interview with the older daughter.

{¶18} The in-camera interview was provided on a DVD. This Court attempted to review the first copy, but it was defective and could not be played. This Court contacted the clerk of courts, another DVD was created, and the clerk provided it to this Court.

{¶19} Because of the lengthy delays necessary to address the problems with the record, this Court questioned whether all or a portion of Father's first assignment of error may have been rendered moot. We specifically asked the parties to address the history of Father's parenting time, including his attendance and completion, or lack thereof, of the trial court ordered counseling sessions. Both parties responded. Father maintained that the appeal was not moot and that he had received no parenting time. However, Father failed to discuss whether he had attended counseling or whether it had been completed.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY TERMINATING APPELLANT'S PARENTING TIME WITH HIS CHILDREN FOR 18 MONTHS AND THEREAFTER UNREASONABLY LIMITING HIS PARENTING TIME WITHOUT JUSTIFICATION AND BY ABROGATING ITS RESPONSIBILITY FOR MAKING A FAIR AND JUST ORDER GRANTING HIM FREQUENT PARENTING TIME TO A "REUNIFICATION PROFESSIONAL."

{¶20} Father argues in his first assignment of error that the trial court erred in suspending his parenting time and then in adopting a magistrate's decision that unreasonably limited his parenting time. While Father brings up the interim suspension of parenting time, Father has not developed an argument explaining how the trial court erred in temporarily suspending Father's parenting time in light of the allegations of abuse that were raised. *See* App.R. 16(A)(7). Nor has Father explained why this issue would not be moot given that those orders are no longer in effect. *See* App.R. 12(A)(1)(c); *see also Makruski v. Makruski*, 9th Dist.

Lorain No. 17CA011088, 2018-Ohio-1102, ¶ 9. Accordingly, the portion of Father's assignment of error related to the interim suspension of parenting time will not be addressed.

**{¶21}** Father's remaining argument is that the trial court unreasonably limited Father's parenting time. Father also maintains that the trial court abdicated its duty by authorizing the reunification professional to determine when parenting time could be expanded and in only allowing him to petition for a specific order of parenting time after reunification counseling was completed.

**{¶22}** Generally, this Court reviews a trial court's action with respect to a magistrate's decision for an abuse of discretion. *Tabatabai v. Tabatabai*, 9th Dist. Medina No. 08CA0049-M, 2009-Ohio-3139, ¶ 17. An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "In so doing, we consider the trial court's action with reference to the nature of the underlying matter." *Tabatabai* at ¶ 18. "We review a decision regarding parenting time for an abuse of discretion." (Internal quotations and citations omitted.) *In re K.M.L.*, 9th Dist. Wayne No. 17AP0009, 2018-Ohio-344, ¶ 6.

**{¶23}** "[I]n the absence of a shared parenting plan, motions to modify parenting time are analyzed under R.C. 3109.051 * * *. When a trial court determines parenting time under R.C. 3109.051, it must do so consistent with the best interests of the children involved with consideration of the factors mentioned in R.C. 3109.051(D)." (Internal quotations and citations omitted.) *Id.*; *see also* R.C. 3109.12(B) ("The court may grant the parenting time rights or companionship or visitation rights requested under division (A) of this section, if it determines that the granting of the parenting time rights or companionship or visitation rights is in the best interest of the child. In determining whether to grant reasonable parenting time rights or

reasonable companionship or visitation rights with respect to any child, the court shall consider all relevant factors, including, but not limited to, the factors set forth in division (D) of section 3109.051 of the Revised Code."). "A trial court need not make explicit reference to these factors provided that it is apparent from the record that the factors were considered." (Internal quotations and citation omitted.) *In re K.M.L.* at ¶ 6.

{¶24} R.C. 3109.051(D) provides:

In determining whether to grant parenting time to a parent pursuant to this section or section 3109.12 of the Revised Code or companionship or visitation rights to a grandparent, relative, or other person pursuant to this section or section 3109.11 or 3109.12 of the Revised Code, in establishing a specific parenting time or visitation schedule, and in determining other parenting time matters under this section or section 3109.12 of the Revised Code or visitation matters under this section or section 3109.11 or 3109.12 of the Revised Code, the court shall consider all of the following factors:

(1) The prior interaction and interrelationships of the child with the child's parents, siblings, and other persons related by consanguinity or affinity, and with the person who requested companionship or visitation if that person is not a parent, sibling, or relative of the child;

(2) The geographical location of the residence of each parent and the distance between those residences, and if the person is not a parent, the geographical location of that person's residence and the distance between that person's residence and the child's residence;

(3) The child's and parents' available time, including, but not limited to, each parent's employment schedule, the child's school schedule, and the child's and the parents' holiday and vacation schedule;

(4) The age of the child;

(5) The child's adjustment to home, school, and community;

(6) If the court has interviewed the child in chambers, pursuant to division (C) of this section, regarding the wishes and concerns of the child as to parenting time by the parent who is not the residential parent or companionship or visitation by the grandparent, relative, or other person who requested companionship or visitation, as to a specific parenting time or visitation schedule, or as to other parenting time or visitation matters, the wishes and concerns of the child, as expressed to the court;

(7) The health and safety of the child;

(8) The amount of time that will be available for the child to spend with siblings;

(9) The mental and physical health of all parties;

(10) Each parent's willingness to reschedule missed parenting time and to facilitate the other parent's parenting time rights, and with respect to a person who requested companionship or visitation, the willingness of that person to reschedule missed visitation;

(11) In relation to parenting time, whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of the adjudication; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(12) In relation to requested companionship or visitation by a person other than a parent, whether the person previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether the person, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of the adjudication; whether either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent previously has been convicted of an offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that the person has acted in a manner resulting in a child being an abused child or a neglected child;

(13) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(14) Whether either parent has established a residence or is planning to establish a residence outside this state;

(15) In relation to requested companionship or visitation by a person other than a parent, the wishes and concerns of the child's parents, as expressed by them to the court;

(16) Any other factor in the best interest of the child.

{¶25} "In order to further a child's best interests, the court has the discretion to limit or restrict visitation rights, including the power to restrict the time and place of visitation, to determine the conditions under which visitation will take place and to deny visitation rights altogether if visitation would not be in the best interests of the child." (Internal quotations and citations omitted.) *Harrison v. Lewis*, 9th Dist. Summit No. 28114, 2017-Ohio-275, ¶ 40.

{¶26} In light of the record before us, including the testimony discussed above, the recommendations of the guardian ad litem, and the in-camera interview of the older daughter, which the trial court appears to have found compelling, we cannot conclude that the trial court abused its discretion in choosing to limit, restrict, or even eliminate Father's parenting time. In so concluding, we have independently reviewed the in-camera interview and determine that, if the assertions made therein were believed, the trial court had before it ample evidence to support the changes it made to the amount and nature of Father's parenting time.

{¶27} Nonetheless, we agree with Father that the trial court did abuse its discretion in the manner in which it set up the reunification counseling. The trial court's judgment provides for no periodic reviews to address the status of the reunification counseling, nor does it seek recommendations from the counselor to inform the trial court's decision making process. Instead, the entry provides that "Father's parenting time and communication with the minor children shall be expanded as recommended by the reunification professional[]" and it is only after the reunification process is concluded that "Father may petition the Court for a specific order of parenting time." This leaves the expansion of Father's parenting time entirely in the hands of the reunification professional. The trial court's role is to determine the best interests of the children and fashion a parenting time order that reflects the same. *See* R.C. 3109.12(B).

While the trial court is free to seek recommendations from qualified professionals, it is not those professionals' role or duty to determine what is appropriate parenting time; that role and duty belongs to the trial court.

{¶28} Thus, we sustain Father's first assignment of error in part. We note that, based upon arguments in the briefs, there appears to be some confusion among the parties as to the amount and nature of Father's parenting time. It is somewhat unclear from the trial court's entry whether Father is entitled to some supervised parenting time irrespective of his participation in reunification counseling or whether Father is barred from having any parenting time until he begins reunification counseling. Upon remand, the trial court should clarify the amount and nature of Father's parenting time.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN MODIFYING APPELLANT'S CHILD SUPPORT OBLIGATION WHERE IT UNREASONABLY INCLUDED IN HIS GROSS INCOME (1) HIS EMPLOYER'S COST OF HEALTH INSURANCE; (2) CLAIMED ATTORNEY'S FEES SUPPOSEDLY PAID BY THE EMPLOYER FOR HIS BENEFIT; AND (3) IMPUTED SUBSTANTIAL INCOME TO HIM WHERE THERE WAS NO EVIDENCE OF VOLUNTARY UNEMPLOYMENT OR UNDEREMPLOYMENT.

{¶29} Father argues in his second assignment of error that the trial court erred in its computation of child support. Specifically, Father alleges that the trial court should not have included the amount of money that his employer paid for health insurance in his gross income, should not have included attorney fees paid for by his employer in his gross income, and erred in imputing income to him as the evidence did not support that Father was voluntarily underemployed.

{¶30} The magistrate concluded that Father's actual income was $50,000 but found him voluntarily underemployed and imputed an additional $93,084 in income to him for a total

income of $143,084. This amount was similar to Father's 2011 income. The magistrate ordered Father to pay $1,760.58 per month in child support plus a processing charge. Father objected to some of the magistrate's findings, including its finding with respect to Mother's income, the finding that Father was voluntary underemployed, and the finding that Father's personal expenses were being paid by his employer. In addition, Father asserted that the magistrate erred in failing to value those expenses allegedly paid for by Father's employer.

{¶31} The trial court sustained Father's objection with respect to Mother's income and altered factual findings with respect to Father's income. The trial court found Father's actual income to be $108,421, which included various payments Father's employer made for him including health insurance, cell phone, vehicle insurance, and attorney fees. In addition, the trial court found Father to be voluntarily underemployed and capable of earning the same figure that was used in the prior order. Accordingly, the trial court imputed $33,601 in additional income, for a total income of $142,022. The trial court recalculated Father's child support obligation and found it to be $1,714.15 per month plus the processing fee.

{¶32} Generally, this Court reviews a trial court's action with respect to a magistrate's decision for an abuse of discretion. *Tabatabai v. Tabatabai*, 9th Dist. Medina No. 08CA0049-M, 2009-Ohio-3139, ¶ 17. An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "In so doing, we consider the trial court's action with reference to the nature of the underlying matter." *Tabatabai* at ¶ 18. "Matters involving child support are reviewed under an abuse-of-discretion standard." *Morrow*, 138 Ohio St.3d 11, 2013-Ohio-4542, at ¶ 9.

{¶33} In the current magistrate's decision, which was adopted by the trial court, the magistrate noted that Father has been employed by Ohio College of Massotherapy ("OCM"), a

non-profit corporation, and OCM Online, a for-profit corporation, for over 20 years. When Father's child support obligation was established, his income was determined to be $148,625, based upon a three-year average, and his obligation was found to be $2,154.95 per month. In 2009, Father argued his support obligation should be decreased; however, ultimately, the trial court retained the prior support obligation figure. During that time period, Father was the president of OCM and OCM Online and received a salary from both organizations. *See Morrow,* 2012-Ohio-3875, at ¶ 29.

**{¶34}** In 2014, Father again moved to modify his child support obligation. In June 2015, Father filed a supplemental memorandum in support of his motion to modify child support. In that memorandum, Father maintained his gross income for child support purposes for 2014 was $99,452, which included $80,000 in salary from the two companies, Father's employer-paid health insurance benefits, and the value of his employer-paid cell phone benefits. He argued that a three-year average of his income from 2012-2014 would be drastically less than the $143,622 figure that was used as his income during the 2009 proceedings. Additionally, Father argued that Mother's income had significantly increased.

**{¶35}** At the 2015 hearing, Father testified that his income began decreasing in 2009 with a downturn in the economy, which led to a downturn in his employer's revenues. Father indicated that a portion of the building the college owned was then for lease. Father testified to being the current president emeritus of OCM and OCM Online and that he started that position sometime several months before the hearing. Prior to that, Father was president of the two organizations and had an ownership interest in OCM Online; although, he divested himself of that interest in 2014. Father asserted that it was a mistake that his March 2015 responses to interrogatories still indicated that he was president of OCM and OCM Online. Beginning in

2015, Debra Smith became the president of OCM and OCM Online. Father transferred his 100% interest in OCM Online to Ms. Smith for $1. Ms. Smith confirmed that enrollment at the school was down and the salaries of employees had either been cut or have been stagnant. She estimated that revenues were around half of what they were when she started with the college in 2003. Ms. Smith testified that her salary has not changed since 2008 and that both she and Father are the only full-time employees that have their health insurance premiums entirely paid for by the college. Father's insurance covered his children as well.

{¶36} Father maintained that his W-2 income from 2012-2014 was $80,000 and that his current salary was $50,000. He admitted that it was a voluntary salary reduction and that, based upon his employer's payment of other expenses, he was "still at $80,000" and "[n]othing ha[d] changed." Despite the college's alleged financial troubles, the college continued to pay certain expenses on Father's behalf. Father acknowledged that the college paid his health insurance, his cell phone bill, the mortgage, taxes and insurance on the house he lived in but had transferred to the school, and for the vehicle he gifted back to the college after buying it from the college. Father described his employer-paid health insurance as part of his salary and that it would make no difference whether the college paid for his insurance or gave him the money so that he could personally pay the insurance premiums. The school also extended a $50,000 line of credit to one its board members. Additionally, for a time in 2014, Father's then wife was employed with the school and was also receiving a vehicle to drive. She continued to drive that vehicle even after she was no longer employed by the college. The college also paid for certain medical expenses of Father's children.

{¶37} Ms. Smith testified that towards the end of 2014, Father transferred his house to the school; the equity in the house, which was somewhere between $150,000 to $200,000, was to

be used to reimburse the school for attorney fees that the school had paid. However, Father testified that the mortgage was still in Father's name. Father continued to live in the house and the school paid the mortgage payment, taxes, and insurance. Ms. Smith testified that Father's salary was reduced a corresponding amount.

{¶38} Ms. Smith estimated that the school had paid approximately $100,000 of Father's attorney fees. Father estimated that the school had paid well over $100,000 in his legal fees and had been doing so since 2009. Additionally, Father agreed that the college had "pretty much" paid his attorney fees for the case for 2012, 2013, and 2014. Father also acknowledged that prior to 2014, the college never requested that Father pay back the college for the attorney fees it had paid. Instead, in the fall of 2014, Father made the decision to transfer the car and house to the college to cover the legal fees because he believed "[i]t was only right" to do so. On cross-examination, Father was asked whether his discovery responses indicated that between 2012 to 2014 the college had paid what amounted to be an average of $8,231 a year in attorney fees. Father indicated that he could not say for sure "without actually seeing everything[,]" but did not outright deny that the college had paid that amount. He did testify that the college had paid a lot more than that in legal fees in earlier years. While Father alleged that all of the legal fees paid were not for the instant matter, and that some were for the school, Father did not produce any documentary evidence of the same.

{¶39} In early 2014, the school also sold a Lexus automobile to Father for $18,000, but towards the end of 2014, Father donated the car back to the school. Father continued to drive the vehicle and the school made the payments on it. Ms. Smith testified that Father donated it back to cover things like attorney fees that the school had paid.

**Employer-paid Benefits**

{¶40} The Supreme Court has stated:

> The amount of a parent's child-support obligation is calculated by using a child-support computation worksheet. R.C. 3119.023. The starting point is parental income: either gross income (for those employed to full capacity) or gross income plus potential income (for those not employed to full capacity). R.C. 3119.01(C)(5). * * * [T]he statutory definition of "gross income" is expansive. "Gross income" is defined as "the total of all earned and unearned income from all sources during a calendar year." R.C. 3119.01(C)(7). The provision includes many examples of items that constitute gross income, such as commissions and dividends. The statutory scheme also includes items that are specifically excluded from "gross income," such as means-tested government assistance and nonrecurring income.

*Morrow*, 138 Ohio St.3d 11, 2013-Ohio-4542, at ¶ 11. As noted by this Court in the 2012 appeal, the list of includable income includes "all other sources of income[.]" *Morrow*, 2012-Ohio-3875, at ¶ 28.

{¶41} In Father's prior appeal to the Supreme Court, the Supreme Court concluded that the definition of gross income in the statute was expansive enough to include certain employer-paid benefits. *See Morrow,* 138 Ohio St.3d 11, 2013-Ohio-4542 at ¶ 15. Those benefits included a car, car insurance, and a cell phone under circumstances where the record indicated that Father did not have a car, car insurance, or cell phone other than the ones provided for by his employer. *See id.* The Supreme Court noted that, "[i]f his employer did not provide a car, [Father] would have had to purchase or lease one on his own, using his own funds. Accordingly, it is sensible to conclude that the provision of a car is no different from the provision of funds to buy or lease a car. Either way, the person receiving the benefit effectively has a higher income." *Id.*

{¶42} On appeal, Father maintains that the value of his health insurance premiums and the attorney fees paid by his employer should not have been considered as part of his income.

With respect to the attorney fees, Father additionally argues that the record does not support that his employer paid $8,321 in attorney fees for the years 2012 through 2014.

{¶43} Father asserts that the issue of whether employer-paid health insurance benefits are includable in gross income for purposes of child support has never been squarely addressed by any court in Ohio, although the issue was raised and discussed in *Bodrock v. Bodrock*, 8th Dist. Cuyahoga No. 104177, 2016-Ohio-5852. Father maintains that "including the employer's cost of providing health insurance to employees would open Pandora's box in child support modification cases." However, we see no reason to make a general rule in this case.

{¶44} Under the facts of this case, we cannot say that the trial court abused its discretion in including the value of Father's employer-paid health insurance premiums as income for purposes of calculating child support. In Father's memorandum in support of his motion to modify child support, Father himself included the value of the employer-paid health insurance premiums in calculating his gross income for 2014. While Father argued in his objections to the magistrate decision that the value of the health insurance should not have been included, Father offered no explanation for the disparity between his memorandum and his objections. Additionally, there was evidence that employer-paid health insurance was not a general benefit to employees, but was a benefit only Ms. Smith and Father were receiving. Father viewed the benefit as part of his salary and commented that if the employer did not provide it he would have to use money received from the employer to purchase it. *See Morrow,* 138 Ohio St.3d 11, 2013-Ohio-4542 at ¶ 15. The record is also clear the magistrate and trial court believed that Father was using his position and status with his employer to manipulate his income in order to lessen his child support obligation. Given all of the foregoing circumstances, we cannot say that the

trial court abused its discretion in including the value of the health insurance premiums Father's employer paid on his behalf as part of his gross income for purposes of calculating child support.

{¶45} Father additionally argues that the trial court erred in including $8,321 in attorney fees as part of his gross income for purposes of calculating child support.

{¶46} As noted above, Father was asked on cross-examination about the attorney fees the college had paid on his behalf. Father acknowledged that his attorney fees for the years 2012 through 2014 had been "[p]retty much" paid for by the college. Father was asked whether the figures for the three years were $9,800, $3,600, and $11,295 (which averages to $8,321 per year). While Father indicated that he could not say for sure without "actually seeing everything[,]" Father also did not deny the amount. Ultimately, the trial court used $8,321 as the value of the attorney fees that it added to Father's gross income.

{¶47} Father argues there is no evidence in the record to support the trial court's figure. Unfortunately, the discovery responses that are mentioned in the cross-examination of Father are not part of the record. Accordingly, those responses cannot be considered as evidence. Moreover, if Father's answer to the question about those discovery requests cannot be considered as an acknowledgment of those amounts, then there is no support for the figure obtained by the trial court. Nonetheless, Father did testify that the college had paid over $100,000 in legal fees since 2009. That would average to over $16,000 per year between the years 2009 and 2015. Accordingly, any error in the amount determined by the trial court appears to be in Father's favor.

{¶48} Father also contends that the payment of the fees was either a gift or a loan and should not be included in gross income. While there was evidence in the record that could support Father's claim, the record is clear that the magistrate and trial court did not believe

Father or the testimony concerning the college's financial troubles. In light of the foregoing, the trial court could have reasonably concluded, based upon the evidence presented and its assessments of credibility, that Father did not have an obligation to pay back the fees and that fees were instead paid to Father in lieu of a portion of his salary. Further, there was also evidence via Father's own testimony that this payment of attorney fees was recurring. *See* R.C. 3119.01(C)(8) (defining nonrecurring income); R.C. 3119.01(C)(7) (defining gross income and excluding nonrecurring income). Thus, we cannot say that the trial court abused its discretion in including Father's employer's payment of Father's legal fees in the calculation of Father's gross income.

**Imputed Income**

{¶49} Father also challenges the trial court decision to impute $33,601 in income to Father.

{¶50} As discussed above, "[i]n determining the appropriate level of child support, a trial court must calculate the gross income of the parents." *Stahl v. Stahl*, 9th Dist. Summit No. 27876, 2017-Ohio-4170, ¶ 19, quoting *Bajzer v. Bajzer*, 9th Dist. Summit No. 25635, 2012-Ohio-252, ¶ 11. R.C. 3119.01(C)(5) defines "[i]ncome" as used in Chapter 3119 as: "a) For a parent who is employed to full capacity, the gross income of the parent; (b) For a parent who is unemployed or underemployed, the sum of the gross income of the parent and any potential income of the parent."

> "Potential income" means both of the following for a parent who the court pursuant to a court support order, or a child support enforcement agency pursuant to an administrative child support order, determines is voluntarily unemployed or voluntarily underemployed:
>
> (a) Imputed income that the court or agency determines the parent would have earned if fully employed as determined from the following criteria:

(i) The parent's prior employment experience;

(ii) The parent's education;

(iii) The parent's physical and mental disabilities, if any;

(iv) The availability of employment in the geographic area in which the parent resides;

(v) The prevailing wage and salary levels in the geographic area in which the parent resides;

(vi) The parent's special skills and training;

(vii) Whether there is evidence that the parent has the ability to earn the imputed income;

(viii) The age and special needs of the child for whom child support is being calculated under this section;

(ix) The parent's increased earning capacity because of experience;

(x) The parent's decreased earning capacity because of a felony conviction;

(xi) Any other relevant factor.

(b) Imputed income from any nonincome-producing assets of a parent, as determined from the local passbook savings rate or another appropriate rate as determined by the court or agency, not to exceed the rate of interest specified in division (A) of section 1343.03 of the Revised Code, if the income is significant.

R.C. 3119.01(C)(11). "[T]he trial court cannot impute income to either party without first making a finding that the party is voluntarily unemployed or underemployed." (Internal quotations and citations omitted.) *Collins v. Collins*, 9th Dist. Wayne No. 10CA0004, 2011-Ohio-2087, ¶ 27. "The burden of proof is on the parent who is claiming that the other is voluntarily unemployed or underemployed." *Stahl* at ¶ 19.

{¶51} "This Court reviews a trial court's factual finding that a parent is voluntarily unemployed to determine if it was against the manifest weight of the evidence." *Id*., citing *Kent v. Kent*, 9th Dist. Summit No. 25231, 2010-Ohio-6428, ¶ 10-12. "The amount of potential income the court imputes once it finds voluntary unemployment, however, is a discretionary

determination that this Court will not disturb on appeal absent an abuse of discretion." *Stahl* at ¶ 19, citing *Rock v. Cabral*, 67 Ohio St.3d 108 (1993), syllabus.

{¶52} The record is clear that the magistrate and trial court did not find Father's position with respect to his income to be credible. Father's witnesses were subjected to thorough cross-examination by Mother's counsel; that cross-examination called into question the credibility of the testimony related to Father's income and the health of OCM and OCM Online. The trial court expressed concern that Father had manipulated his income in order to decrease his child support obligation. Father argues that that was not possible because he was no longer the president of OCM and OCM Online, was no longer on the board, and no longer had an ownership interest in OCM Online. Even assuming the same, the trial court could have nonetheless reasonably found that Father's views could carry significant weight with those in authority and that he could use his long history with the college to his benefit. There was evidence that Father's uncle sat on the board, as did Ms. Smith and another individual that Father had known for several years. Father remained an employee of OCM and OCM Online and held the title president emeritus. Additionally, Father continued to have numerous personal expenses paid for by his employer despite the fact that he steadfastly maintained that the institution was struggling financially. Moreover, the college extended a line of credit to one of the board members and continued paying for a car Father's second ex-wife used even after she was no longer employed with the college. Ms. Smith testified that she became president because Father was spending more time out of the office due to court matters and she had "to step up and do a lot more than [her] job entailed[.]" However, there was no testimony that Father's responsibilities changed or even what Father's responsibilities were as the president emeritus, and in fact, Ms. Smith indicated that because she was president and Father was president

emeritus, they were both "kind of" president now. Father himself admitted that his salary reduction from $80,000 to $50,000 was a voluntary reduction.

{¶53} Further, while Ms. Smith and Father denied that the college paid Father's utilities, Father's testimony concerning his utility payments could have been viewed with skepticism. Father maintained that he often paid his utilities with cash or sometimes did not pay them, even though there was money in his checking account at the time. Father acknowledged that there were months during 2014 during which his checking account, which contained deposits from the college, did not reflect any deductions for gas, electric, or trash bills. While the trial court did not find that Father's employer paid his utility bills, and therefore, did not include the value of them in its computation of Father's actual income, the trial court could have nonetheless considered these circumstances in evaluating Father's credibility and whether Father was voluntarily underemployed.

{¶54} Finally, the record is clear that the magistrate and trial court did not find the assertion that the college was suffering financially to be credible in light of the extensive personal expenses of Father that the school continued to pay and Father's failure to produce any documents to corroborate the alleged decline in enrollment and resultant troubled finances.

{¶55} Ultimately, the trial court found that Father was capable of earning income equivalent to his previous earnings, which would amount to $33,601 in imputed income. *See* R.C. 3119.01(C)(11)(vii). If Father was able to manipulate his income and the college was not suffering financially, it would not be unreasonable for the trial court to conclude that Father was capable of earning the extra $33,601 that was imputed to him. *See* R.C. 3119.01(C)(11)(vii); R.C. 3119.01(C)(11)(xi). Given all of the foregoing circumstances, it was not against the manifest weight of the evidence for the trial court to conclude that Father was voluntarily

underemployed and that Father was capable of earning what he had previously earned, resulting in an imputation of $33,601 in income.

**{¶56}** Father's second assignment of error is overruled.

III.

**{¶57}** Father's first assignment of error is sustained to the extent discussed above and the second assignment of error is overruled. The trial court's judgment is affirmed in part, and reversed in part, and the matter is remanded for proceedings consistent with this opinion.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

DONNA J. CARR
FOR THE COURT

CALLAHAN, J.
CONCURS.

HENSAL, P. J.
CONCURS IN JUDGMENT ONLY.


APPEARANCES:

BRENT L. ENGLISH, Attorney at Law, for Appellant.

LINDA G. HOFFMAN, Attorney at Law, for Appellee.

RICHARD MARCO, Guardian ad Litem.